Of Counsel:

BAYS LUNG ROSE & VOSS

BRUCE D. VOSS          6532-0
Attorney at Law
A Law Corporation
JOHN D. FERRY III          9143-0
Topa Financial Center
700 Bishop Street, Suite 900
Honolulu, Hawaii 96813
Telephone:  (808) 523-9000
Facsimile: (808) 533-4184
Email:      bvoss@legalhawaii.com
            jferry@legalhawaii.com

Attorneys for Plaintiffs
KARINA ROWAN and FRANK ROWAN

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| KARINA ROWAN and FRANK ROWAN,<br><br>              Plaintiffs,<br><br>      vs.<br><br>KEVIN DITAMORE; AYUMI DITAMORE; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE ENTITIES 1-10; and DOE GOVERNMENTAL ENTITIES 1-10,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL NO. 20-00543 JMS-RT<br>(Contract)<br><br>STIPULATION FOR PLAINTIFFS TO FILE FIRST AMENDED COMPLAINT AND ORDER; EXHIBIT A<br><br><br><br><br><br><br><br>Judge:  Magistrate Judge Rom Trader<br>Trial Judge: J. Michael Seabright<br>Trial Date: April 19, 2022 |

## STIPULATION FOR PLAINTIFFS TO FILE FIRST AMENDED COMPLAINT

Plaintiffs Karina Rowan and Frank Rowan ("Plaintiffs") and

Defendants Kevin Ditamore and Ayumi Ditamore ("Defendants"), by and through

their respective undersigned counsel, hereby stipulate and agree as follows

("Stipulation"):

1.    This Stipulation is made pursuant to Rule 10.4 of the Local

Rules of Practice for the United States District Court for the District of Hawaii

("LR") and Rule 15(a)(2) of the Federal Rules of Civil Procedure ("FRCP").

2.    Pursuant to the Court's Rule 16 Scheduling Order, the deadline

to file motions to join additional parties or to amend pleadings has not expired.

See Dkt. 13, PID #920.

3.    Plaintiffs wish to file their First Amended Complaint ("FAC"),

a redlined copy of which is attached as Exhibit A pursuant to LR Rule 10.4.

4.    Plaintiffs have shared a redlined copy of the FAC with counsel

for Defendants, who have agreed to stipulate to the filing of the FAC pursuant to

LR Rule 10.4 and FRCP Rule 15(a)(2).

5.    This Stipulation is signed by counsel of all parties that have

appeared in this action.

DATED: Honolulu, Hawaii, August 24, 2021.

/s/ John D. Ferry III
BRUCE D. VOSS
JOHN D. FERRY III

Attorneys for Plaintiffs
KARINA ROWAN and FRANK ROWAN

/s/ Randall K. Schmitt
RANDALL K. SCHMITT
NICHOLAS K. N. KIDO

Attorneys for Defendants
KEVIN DITAMORE and
AYUMI DITAMORE

APPROVED AS TO FORM AND SO ORDERED:

DATED: Honolulu, Hawaii, September 2, 2021.

Rom A. Trader
United States Magistrate Judge

*Karina Rowan and Frank Rowan v. Kevin Ditamore and Ayumi Ditamore, et al.;*
Civil No. 20-00543 JMS-RT; STIPULATION FOR PLAINTIFFS TO FILE
FIRST AMENDED COMPLAINT

Of Counsel:

BAYS LUNG ROSE & ~~HOLMA~~VOSS

~~KARIN L. HOLMA          5207-0~~
BRUCE D. VOSS          6532-0
Attorney at Law
A Law Corporation
~~JASON W. JUTZ          10659-0~~
JOHN D. FERRY III          9143-0
Topa Financial Center
700 Bishop Street, Suite 900
Honolulu, Hawaii  96813
Telephone:  (808) 523-9000
Facsimile: (808) 533-4184
Email:      ~~kholma~~bvoss@legalhawaii~~.com~~
            ~~jjutz@legalhawaii.com~~

~~RICHARDS & ZENGER~~

~~MARK R. ZENGER          3511-0~~
~~P.O. Box 3966~~
~~Lihue, Hawaii  96766~~
~~Telephone:  (808) 632-0723~~
~~Facsimile:  (808) 632-0724~~
~~Email:  mrz@richardsandzenger~~.com
          jferry@legalhawaii.com

Attorneys for Plaintiffs
KARINA ROWAN and FRANK ROWAN

IN THE ~~CIRCUIT~~UNITED STATES DISTRICT COURT ~~OF~~

FOR THE ~~FIFTH CIRCUIT~~
~~STATE~~DISTRICT OF ~~HAWAII~~HAWAI'I

| KARINA ROWAN and FRANK ROWAN, | ) | CIVIL NO. |
|---|---|---|
| | ) | ~~20-~~ |
| | ) | 00543 JMS-RT |

**EXHIBIT A**

|  |  |
|---|---|
| Plaintiffs, | ) (Contract) |
| | ) |
| vs. | ) FIRST AMENDED COMPLAINT; |
| | ) DEMAND FOR JURY TRIAL; |
| KEVIN DITAMORE; AYUMI | ) SUMMONS |
| DITAMORE; CASCADE JOINERY, | ) |
| INC.; GREG ROBINSON, dba as | ) |
| GREG ROBINSON ARCHITECT; | ) |
| BEAUDETTE CONSULTING | ) |
| ENGINEERS, INC., nka DCI | ) |
| ENGINEERS, INC.; HOMESCOOP | ) |
| INC., dba KAUAI HOME | ) |
| INSPECTION SERVICES; JOHN | ) |
| DOES 1-10; JANE DOES 1-10; DOE | ) |
| CORPORATIONS 1-10; DOE | ) |
| PARTNERSHIPS 1-10; DOE | ) |
| ENTITIES 1-10- | ) |
| 10; and DOE GOVERNMENTAL | ) Judge:  Magistrate Judge Rom Trader |
| ENTITIES 1-10, | ) Trial Judge: J. Michael Seabright |
| | ) Trial Date: April 19, 2022 |
| Defendants. | ) |
| | ) |
| | ) |

## FIRST AMENDED COMPLAINT

Plaintiffs KARINA ROWAN and FRANK ROWAN (collectively,

"BuyersPlaintiffs"), by and through their attorneys, Bays Lung Rose & Holma and

Richards & Zenger, assert the following First Amended Complaint ("FAC")

against Defendants KEVIN DITAMORE and ;AYUMI DITAMORE; CASCADE

JOINERY, INC.; GREG ROBINSON, dba as GREG ROBINSON ARCHITECT;

BEAUDETTE CONSULTING ENGINEERS, INC., nka DCI ENGINEERS, INC.;

and HOMESCOOP INC., dba KAUAI HOME INSPECTION SERVICES

(collectively, "~~Sellers~~Defendants")~~,~~ and allege and aver as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction ~~over this action pursuant to Hawaii Revised Statutes ("HRS") § 603-21.5~~under 28 U.S.C. § 1332(a)(2) because there is complete diversity between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.00.

2.    ~~All matters and~~Venue in the District of Hawaii is proper under 28 U.S.C. § 1391 because the subject real property is located in the State of Hawaii, the subject contract for the sale and purchase of the subject real property was made in the State of Hawaii, and a substantial part of the events giving rise to ~~the claims set forth in~~ this ~~Complaint~~action occurred in the ~~County of Kauai,~~ State of Hawaii.

3.    ~~Venue is proper in the Circuit Court of the Fifth Circuit, State of Hawaii pursuant to HRS § 603-36(5).~~

## PARTIES

3.    ~~4. Buyers~~ Plaintiffs are residents of the State of Nevada who~~, at all times relevant, were the buyers of~~ purchased and ownthe subject real property located in the County of Kauai, State of Hawaii.

4.     5. Upon information and belief, Defendants KEVIN

DITAMORE and AYUMI DITAMORE (collectively, "Ditamores" or "Sellers")

were, at all times relevant, residents of the County of Kauai, State of Hawaii.

5.     Upon information and belief, Defendant BEAUDETTE

CONSULTING ENGINEERS, INC. ("Beaudette") was, at all relevant times, was

incorporated and located in the State of Montana.

6.     Upon information and belief, Beaudette later merged with

Defendant DCI ENGINEERS, INC. ("DCI"), which was incorporated and located

in the State of Washington.

7.     Upon information and belief, as a result of the merger, DCI

assumed Beaudette's liabilities, whether known or unknown, which existed at the

time of the merger. For purposes of this FAC, Beaudette and DCI are collectively

referred to as "Beaudette."

8.     Upon information and belief, Defendant CASCADE JOINERY

INC. ("Cascade") was, at all relevant times, incorporated and located in the State

of Washington.

9.     Upon information and belief, Defendant GREG ROBINSON

dba GREG ROBINSON ARCHITECT ("Robinson" or "GRA") was, at all relevant

times, an architect licensed in the State of Washington and in the State of Hawaii.

4

894204.1
1010019.1

10.    Upon information and belief, HOMESCOOP INC., dba KAUAI HOME INSPECTIONS ("KHI") was, at all relevant times, incorporated and located in the State of Hawaii.

11.    ~~6.~~ Defendants John Does 1-10, Jane Does 1-10, Doe Corporations 1-10, Doe Partnerships 1-10, Doe Entities 1-10, and Doe Governmental Entities 1-10 are persons or entities who are liable to ~~Buyers~~Plaintiffs under the cause of action described in this Complaint and whose names, identities, and capacities are presently unknown to ~~Buyers.~~ ~~Buyers~~Plaintiffs.  Plaintiffs have conducted a diligent, good faith effort to ascertain the names, identities, and capacities of such persons or entities.

<u>FACTUAL BACKGROUND</u>

12.    ~~7.~~ In early 2020, ~~Buyers~~Plaintiffs decided to purchase a dream home in Hawaii where they would reside with their two young children.

13.    ~~8.~~ ~~Buyers~~Plaintiffs found what they thought was their dream home on the island of Kauai, in a private, gated community that was previously used as a tree farm.

14.    ~~9.~~ The property is located at 5387-M Kapaka Street, Princeville, Hawaii 96722, TMK: (4) 5-3-008-022 ("Property").

15.    ~~10.~~ The Property is comprised of a 4.5 acre lot with a ~~two~~ three bedroom, two bathroom home ("Residence"), consisting of 3,028 square feet and a

5

detached agricultural building (i.e., a barn) consisting of 983 square feet., located

within the Nahele Lihi condominium project

**The Contract Documents**

**History of the Residence's Design and Construction**

16.    In August 2010, the Ditamores purchased the Property for

$638,000; at the time, the Property was a largely unimproved lot, which the

Ditamores, as owner-builders, planned to develop by constructing the Residence

and other improvements ("Project").

17.    After purchasing the Property, the Ditamores started gathering a

design team and other workers for the Project.

18.    On March 21, 2011, the Ditamores entered into a design

contract with Cascade ("Design Contract"), where Robinson was working as an

architect at the time.

19.    Pursuant to the Design Contract, Cascade agreed to provide the

Ditamores with architectural design services for the Project, including schematic

design, design development, and permit drawings of the Residence. Cascade

estimated that its fees for the Project would not exceed $30,000.

6

20.     At the time that Cascade and the Ditamores entered into the Design Contract, they also anticipated that Cascade would be procuring and supplying crafted lumber for use in construction of the timber frame Residence.

21.     On August 10, 2011, Beaudette submitted its proposal to serve as the Project's structural engineer, which Cascade accepted. In its proposal, Beaudette assumed, among other things, "[t]hat the soil condition is acceptable for conventional foundations," and recommended "the engagement of a qualified professional Geotechnical Engineer to confirm the condition of the site soils for foundational design."

22.     Through the summer and fall of 2011, Cascade, Beaudette and the Ditamores discussed the Project's design and related issues.

23.     Among the issues discussed were how to avoid the County of Kauai's requirement for a grading permit for the Project, which the Ditamores complained would be unduly expensive and time consuming.

24.     Eventually, the Ditamores and Cascade decided to avoid the County of Kauai's grading permit and soil study by, among other things, removing reference to the Property's contour lines from the permit set's site plan, so that the County of Kauai would not be aware of how much grading the Project would require, and how much dirt the Ditamores and their contractors would be cutting and using as fill for the Project.

894204.1
1010019.1

25.    Another issue was the condition of the soil at the Property, and whether the soil condition was sufficient for the Residence's foundations. After Beaudette and Cascade raised concerns, the Ditamores dismissed them. Neither Cascade nor Beaudette raised the issue again.

26.    Later that fall, the Ditamores decided to hire Dana Nicely – whose general contractor's license had expired the year before – to serve as their employee "builder," or de facto general contractor, for the Project.

27.    By December 1, 2011, Cascade and Beaudette had completed and stamped their drafts of the permit set of drawings and structural plans for the Residence.

28.    As previously agreed, Cascade had removed the contours from its site plan in an attempt to avoid the grading permit requirement.

29.    As a result of the scheme to avoid the County of Kauai's grading permit requirement, no grading plans or specifications were ever prepared or certified by a qualified engineer. And no civil, geotechnical or soil engineering study was performed prior to or during the Residence's design and construction.

30.    In early January 2012, shortly after receving a copy of the final permit set of drawings and plans, Nicely started grubbing, grading, preliminary layout and other earthwork.

894204.1
1010019.1

31.     On or about January 20, 2012, the Ditamores – as owner-builders – applied for a permit to construct the Residence, estimated to have a value of $1,022,000, based on the permit set of drawings and plans that Cascade and Beaudette had drafted, stamped, and certified as complete, sufficient, and code compliant.

32.     On or about February 28, 2012, the County of Kauai issued the building permit for the Residence, without requiring a grading permit or soil study.

33.     By that time, Robinson was no longer an employee of Cascade; now doing business as GRA and operating as a subcontractor to Cascade, Robinson continued to consult with the Ditamores on architectural issues that arose during construction; approve and draft changes to the Residence's design; solicit and relay Beaudette's comments as to potential structural concerns; and bill the Ditamores for his services under their Design Contract with Cascade.

34.     However, GRA never visited the site during construction to observe its progress. Neither did Beaudette. And, as mentioned, no civil or geotechnical engineer ever assessed the site or its soil conditions prior to or during construction of the Residence.

35.     Instead, the design team and the Ditamores largely relied upon Nicely and the Ditamores themselves to assess and determine whether the soils,

894204.1
1010019.1

grading, and as-built construction of the Residence were sufficient, structurally sound, code compliant, and otherwise adequate.

36.     On March 6, 2012, Cascade and the Ditamores entered into the previously contemplated Timber Frame Agreement ("Timber Agreement"), pursuant to which the Ditamores agreed to pay Cascade an additional $118,275.00 for work consisting of procuring, preparing, supplying, and overseeing the installation of lumber into the frame of the Residence. The Timber Frame Agreement incorporated the Design Contract, as well as the permit plans and drawings that Cascade and Beaudette previously stamped and the County of Kauai approved, and Cascade reaffirmed the workability of those permit plans and drawings, as well as their compliance with applicable building and land use codes.

37.     Cascade initially planned to deliver the lumber to the Project site by July or August 2012, but experienced trouble procuring all necessary materials to perform its work under the Timber Frame Agreement, which caused delays to framing and roofing the Residence, leaving completed work exposed to the elements. To GRA, the Ditamores expressed concern that Cascade's delays exacerbated the difficulties they were experiencing in keeping the Residence's crawlspace adequately dry and ventilated.

38.     On May 7, 2012, Cascade generated timber frame shop drawings, which GRA and Beaudette also reviewed and approved.

10

894204.1
1010019.1

39.     In August 2012, Nicely notified the Ditamores of his concerns regarding the quality of the Property's soil and the grading work that had been performed, and the effect that the soil quality and grading could have on the Residence's structural integrity.

40.     More specifically, Nicely notified the Ditamores that while he and other workers were digging out and leveling the ground to install footings for the Residence, they found subsurface organic material that rendered the soil unsuitable for construction.

41.     Nicely acknowledged that they had encountered similar conditions throughout other locations of the Property, and had always attempted to dig out the organic material before pouring foundation, but he hoped that it was not a Property-wide issue. As to the remaining footings that needed to be installed, Nicely suggested that they proceed as they had previously: backhoe and dig out whatever organic material they could find, attempt to fill back to grade, and assume that the problem was solved. Nicely stressed that backfilling the "big hole" he and his workers dug for the Residence's lower footings needed to be completed before Cascade arrived to assist with and oversee installation of the lumber.

42.     By September 2012, Cascade's work under the Timber Frame Agreement was complete.

894204.1
1010019.1

43.     Upon information and belief, construction of the Residence was complete in 2013, and the Ditamores moved in shortly afterward.

44.     More than several years later, serious problems with the design and construction of the Residence had become apparent to the Ditamores, who had decided to sell the Property.

45.     Prior to listing the Property for sale, the Ditamores attempted to cover up those problems. A few examples follow.

46.     By June 2018, one of the Residence's load-bearing posts had settled significantly into the ground; the Ditamores contacted Nicely to request that he return to the Property, evaluate the situation, and decide upon a potential quick and inexpensive fix.

47.     After visiting the Property and examining the post in question, and the resultant settling of the Residence, Nicely proposed via text message that he and a two-man crew perform the following remedial work: jack up the Residence where it had settled; remove a section of the sinking post; redo the foundation by adding concrete and rebar; and reset the Residence on the reworked post and base.

48.     The Ditamores approved the remedial work – which Nicely estimated to cost approximately a few thousand dollars, including labor, equipment and materials – but urged Nicely to keep costs down.

12

894204.1
1010019.1

49.     Upon information and belief, Nicely completed the remedial work in the late August 2018.

50.     The Ditamores never consulted with any structural engineer or other qualified design professional regarding the settling of the Residence, the remedial work performed by Nicely, or the impact either the settling or the remedial work had, or would have, on the integrity of the Residence's structural or other components.

51.     Another problem that had become apparent to the Ditamores was mold throughout the Residence.

52.     Upon information and belief, on or about January 12, 2019, the Ditamores contracted with and paid $4,712.04 to Kauai Restoration and Cleaning ("KRC") to "clean[,] treat structural framing underneath home[,] dry out subfloor and structural members, clean & treat under bathroom sink"; KRC also made the following observations and recommendations regarding the mold in the crawlspace: "dryer duct causing issues in crawl space, needs more ventilation."

53.     Shortly afterward, the Ditamores contacted a realtor to discuss listing the Property for sale; after meeting with their realtor in early 2019, the Ditamores decided to delay listing the Property for sale.

54.     Nearly a year later, by early 2020, the Ditamores were once again ready to list the Property for sale.

894204.1
1010019.1

55.     And once again, the Ditamores scrambled to address or cover issues and problems with the Residence prior to the Property going on market.

56.     They painted and patched over cracks and separations that had appeared throughout the interior and exterior of the Residence – cracking and separation which had occurred due to the Residence's settling and structural instability over the prior several years.

57.     Upon information and belief, the Ditamores noticed efflorescence on the basement's concrete floor, and applied a concrete stain or acid wash to the basement floor so that the efflorescence would not be visible during the period in which the Residence was inspected or shown to potential buyers.

58.     The Ditamores were also aware that the post, which Nicely had cut shorter in his attempt to "fix" the settling of the Residence, was rotting and needed to be repaired and refinished; the Ditamores attempted to have that repair and refinishing work done before showing the Property.

59.     Finally, prior to listing the Property, the Ditamores hired KHI to inspect the Property on January 13, 2020, and write a report detailing KHI's inspection, issues of concern, and repair recommendations for the Property ("First Home Inspection Report").

60.     Through their realtor, the Ditamores listed the Property for sale on February 21, 2020.

894204.1
1010019.1

**Plaintiffs and the Ditamores Enter into Purchase Contract**

61.   11. On or about February 24, 2020, ~~Buyers~~Plaintiffs, as "Buyer," signed and entered into a "Purchase Contract," with ~~Sellers~~the Ditamores, as "Seller," for the purchase of the Property ("the Purchase Contract").   ~~Attached hereto as Exhibit 1 is a true and correct copy of the Purchase Contract.~~

62.   12. Pursuant to the Purchase Contract, the agreed-upon purchase price for the Property was $2,707,000.

63.   13. The Purchase Contract contained, *inter alia*, the following provision:

I -1 Seller's Obligation to Disclose.
(a) **Disclosure of Material Facts**. . . . . Seller is obligated to fully and accurately disclose in writing to Buyer any fact, defect, or condition, past or present, that would be expected to measurably affect the value of the Property to a reasonable person (a "material fact"). Seller acknowledges and agrees that the disclosure requirements under Chapter 508D are in addition to all other disclosure obligations of Seller required by law relating to the sale of real property.

(b) **Mandatory Provision of Disclosure Statement**. . . . .Such Disclosure Statement shall be prepared in good faith and with due care and shall disclose all material facts relating to the Property that: (i) are within the knowledge or control of Seller; (ii) can be observed from visible, accessible areas; or, (iii) are required to be disclosed under Section 508D-4.5 and Section 508D-15 of the Hawaii Revised Statutes.

64.   14. The "As-Is Addendum" states as follows:

15

(3) **Sellers' Continuing Responsibilities. SELLER REMAINS OBLIGATED TO DISCLOSE MATERIAL FACTS IN WRITING TO BUYER, AS SUCH OBLIGATION IS SET FORTH IN PARAGRAPHS I-1 AND I-2 OF THE PURCHASE CONTRACT**. In addition, this Addendum does not eliminate any of Seller's responsibilities or obligations as may have been agreed to in the Purchase Contract. . . . .

(6) Buyer's Release and Waiver. …"except for claims which are based upon Seller's and/or Brokerage Firms' (and their licensee's) failure to disclose material facts."

65.   ~~15.~~ The Purchase Contract further stated that the ~~Sellers~~Ditamores were obligated to notify ~~Buyers~~Plaintiffs in writing of "any fact, defect, or condition, past or present, that would be expected to measurably affect the value of the Property to a reasonable person."

**~~Sellers~~The Ditamores'  Misleading Disclosures And ~~Failure~~ Failures To Disclose Material Facts**

66.   ~~16.~~ On February 25, 2020, Sellers provided to ~~Buyers~~Plaintiffs the Sellers Real Property Disclosure Statement ("SRPD")~~. A true and correct copy of the SRPD is attached hereto as Exhibit 2.~~

~~17.   Also, on February 25, 2020, Sellers provided to Buyers a written home inspection report ("~~ along with the First Home Inspection Report~~").~~ ~~A true and correct copy of the Home Inspection Report is attached hereto as Exhibit 3.~~

894204.1
1010019.1

18.   The inspection was performed by Kauai House Inspection Services on January 13, 2020, prior to the house being listed for sale.

.

67.   The SRPD that the Ditamores prepared for Plaintiffs' review did not raise any major red flags.

68.   19. However, Plaintiffs reviewed the First Home Inspection Report and were concerned about certain issues that KHI identified thereinin it. On

69.   Accordingly, on or about February 25, 2020, as part of their due diligence, BuyersPlaintiffs requested a written explanation from the Sellers Ditamores regarding any work or repairs that had been done on the following issues identified in the First Home Inspection Report:

- Water damage at the foundation;
- FaciaFascia rotting;
- Rotting at roof posts/beams;
- Mold beneath master bedroom; and
- Recent leaks at lanai; and.
- If the inspector inspected the Ag building, since there was no pictures of the building in the report.

70.   In the interim, on February 26, 2020,  the Ditamores provided additional information regarding the various issues raised in the First Home Inspection Report which had caused  Plaintiffs concern. Essentially, the Ditamores

17

assured Plaintiffs that all those issues had been addressed or would be addressed as soon as possible.

71.   20. Buyers wereHowever, because Plaintiffs remained concerned about these issues, and Buyersbecause the Property's barn had not been inspected during KHI's January 2020 inspection, Plaintiffs decided that a second home inspection was needed.

21.   The second walk-through

72.   KHI, this time with Plaintiffs as its client, scheduled the second home inspection was scheduled forto occur on February 28, 2020.  Exhibit 4.

22.   On February 26, 2020, in response to Buyers' request, Sellers provided additional information regarding the various issues raised in the home inspection report, including rotting at the roof post/beams, the foundation/crawlspace, and lanai water intrusion issues.

73.   23.During theKHI's second home inspection on February 28, 2020 walk-through inspection, atwhich BuyersPlaintiffs and Sellers were presentthe Ditamores attended,  the parties viewed and discussedcontinued to discuss options to address the moisture/water intrusions into the posts/beams, the structural implications of such water issue, and repair options.

74.    On March 2, 2020, KHI issued Plaintiffs its second report, generated in connection with the February 28 inspection ("Second Home

18

894204.1
1010019.1

Inspection Report"). Plaintiffs paid KHI $1,467.47 for its services and the Second

Home Inspection Report.

75.   24. On March 6, 2020, Sellersthe Ditamores advised

BuyersPlaintiffs via email they had retained someone to fix the post rot.

25.   The March 6, 2020 email indicated the repair time would be

two to four more weeks. , and once again assured Plaintiffs that all issues raised in

the First Home Inspection Report, Second Home Inspection Report, SRPD and

prior communications had been or would be addressed. The Ditamores concluded

their email by assuring Plaintiffs that they should trust that the Ditamores had been

completely honest and forthright during the disclosure process, and by inferring

that the Plaintiffs' requests for information had grown unreasonable:

26.   Subsequently, Buyers contacted another repair company based

on Oahu to discuss the repair needed and obtained an estimate to complete the

work.

Please recognize that I am a person who was honest enough to tell you
about a minor water leak that happened once during a 100+ year
flooding event. I want the buyers to be happy here ... and prepared. If
there was another catastrophic weather event like the one in 2018 the
new owners might need a mop. We were very grateful that we had no
water damage whatsoever from this event, especially in light of
number of homes that were severely flooded, damaged, or destroyed.
There is no ongoing water leak issue in the basement whatsoever.

Finally, let me say that in addition to spending a lot of time and
energy on addressing these maintenance issues, I've also been

19

spending hours and hours responding to questions in writing. I understand the buyers' desire for a property that is in as perfect of condition as possible given the sales price. I want them to be happy and confident in their purchase.Please also understand that for us this is an incredibly busy and stressful time. In addition to working on maintenance issues for inspection and closing, we also have other things going on. We do not yet know where we will move upon closing and we are attempting to identify a property on Maui to purchase (or rent) and this also requires serious attention from us. We have to pack. We have a business to run. It is also tax season. I really am doing my best here. :-}

76.     Privately, the Ditamores complained to their realtor that they had grown tired of responding to Plaintiffs' concerns and questions and were ready for another potential buyer.

77.     The Ditamores then declined Plaintiffs' request to extend the deadline for the Purchase Contract's inspection contingency period and Plaintiffs' associated right to terminate the Purchase Contract.

78.     27. Ultimately, Sellers paid BuyersAs to what appeared to be the sole remaining issue listed in the Second Home Inspection Report which the Ditamores had not addressed, the Ditamores agreed to pay  Plaintiffs $1,500.00 through escrow to have the post rot repairs performedrepaired by the BuyersPlaintiffs subsequent to closing.

28.     After closing, Buyers discovered that Sellers omitted and misrepresented several material issues, including:  structural modifications of the foundation; structural modifications to the roof, deck/lanai, walls, and floor;

20

~~structural modification of the post(s)/beam(s); drainage, flooding or grading~~

~~problems; settling, subsidence or soil problems; defects to decking, railing, lanai,~~

~~foundation/slabs, walls exterior, walls interior; mold; treatment of mold; and water~~

~~infiltration.~~

~~29.    For example,~~

79.    Based on the Ditamores' disclosures, representations and assurances, and the absence of any remaining unaddressed material issues noted in the Second Home Inspection Report, Plaintiffs proceeded with closing, which occurred on April 3, 2020.

**Plaintiffs' Subsequent Discovery and Investigation of Extensive Undisclosed Defects and Damage**

80.    Only after closing and ~~moving onto~~ the ~~Property,~~

~~Buyers~~contractual deadline for rescission expired, Plaintiffs learned that ~~approximately one year to one and a half years prior to the sale of the Property,~~

~~Sellers had made significant structural repairs to the Property.~~

~~30.    Specifically, Mr. Dana Nicely, the president of Nicely Built,~~

~~which had constructed the house, informed Buyers that Sellers prior to putting the~~

~~house on the market, Sellers had asked Nicely Built to address significant settling~~

~~of the post in question.  This work entailed "jacking up the house with a 20 ton~~

~~jack in order to lift and straighten the sag," removing roughly 3 feet of the post,~~

21

and redoing the concrete foundational footing by increasing the size, adding rebar to the new footing, and adding a stainless steel pin to the post, and further reworking the post and footing connection.  The work took approximately three days.  None of this had been disclosed by Sellers to Buyers. the Ditamores had omitted, actively concealed, and misrepresented a host of material facts regarding the Property and its condition, some of which endanger the life and safety of Plaintiffs and their children.

**Structural Defects and Damage**

81.     Plaintiffs met Nicely for the first time on May 31, 2020, several weeks after closing, when he came to the Property.

82.     At that meeting, Nicely told Plaintiffs about the significant structural remedial work he had performed on the post and foundation in the summer of 2018, to address the settling that the Ditamores had observed and wanted to correct before listing the Property for sale.  Nicely described how, when he jacked up the Residence to perform the structural work, the Residence cracked and groaned.

83.     31. Mr. Nicely stated elaborated that the Sellers he had told him about the problem with the Ditamores at the time that he believed the settling had occurred due to puddling of water around the base of the structural post.

22

32.   ~~Mr. Nicely also informed Buyers that he had informed Sellers that the cause of the settling had to do with improper grading issues that needed to be remedied.~~

33.   ~~Mr. Nicely told Buyers that Sellers had not addressed~~, which was caused by improper grading in the ~~grading issues~~area, and that he recommended ~~and that~~at the ~~post has definitely recessed and settled~~time that the Ditamores should correct the grading issue to prevent further ~~into~~settling of the ~~ground~~post and foundation in question.

84.   Nicely went on to state that the Ditamores had not followed his recommendation, the grading issues remained, he could see the Residence had continued to settle since he had ~~completed~~performed the ~~modification work~~remedial structural work in the summer of 2018, and the lanai was starting to sag as a result.

34.   ~~Mr. Nicely also indicated the recession is now causing further sagging of the lanai and attached structures.~~

85.   Prior to Nicely's disclosure, the Plaintiffs did not know or have any reason to know about the settling, grading, or structural issues that the Ditamores had known about and concealed.

86.   In the SRPD, the Ditamores answered "NO" to the following question: "Is there any filled land on this Property?"

23

894204.1
1010019.1

87.     In the SRPD, the Ditamores answered "NO" to the following question: "Has there ever been any settling or slippage, sliding, subsidence, or other soil problems?"

88.     And although the Ditamores answered "YES" to the question "Has there ever been any drainage, water infiltration, seepage, flooding or grading problems?" in the SRPD, their explanation was simply that "[d]uring April 2018 flood we had water seepage under wall in basement stairway. Mopped up; no damage."

89.     In the SRPD, the Ditamores answered "NO" to the following question: "Is there any existing or past damage to the Property or any of the structures (interior or exterior) from earthquake, fire, smoke, flooding, leaks, landslides, falling rocks, tsunami, volcanic activity, or wind?"

90.     In the SRPD, the Ditamores answered "NO" to the following question: "Are there any additional material facts regarding the neighborhood that would be expected to measurably affect the value of the Property (e.g., pesticides, soil problems, irrigation, odors, pending development in the area, road widening projects, zoning changes, rail, etc.?"

91.     In the section of the SRPD entitled "Improvements," the Ditamores answered "NTMK" to the following question: "Were any

24

improvements, additions, structural modifications or alterations built without building permits, association design committee or other governmental approvals?"

92.     In the section of the SRPD entitled "Defects, Repairs or Replacements (Past or Present)," the Ditamores made no reference to the remedial structural work that Nicely performed in summer 2018.

93.     And in their subsequent oral and written communications, the Ditamores never disclosed any issues regarding settling, grading, or the remedial structural work that Nicely performed in summer 2018.

94.     Moreover, neither the First Home Inspection Report nor the Second Home Inspection Report referenced any concerns regarding settling, grading or structural issues or the absence of a proper drainage system.

95.     In fact, the First Home Inspection affirmatively stated that:

The grade around the structure appeared to provide adequate drainage and there were no drainage, moisture issues or damages to the structure(s) observed at the time of inspection due to the grade of the property.

96.     35. Subsequently, Buyers After Nicely's disclosure, Plaintiffs hired a construction consultant to investigate and evaluate the structural modifications made by Sellers.  According to the construction integrity of the Residence. Plaintiffs' consultant, concluded that the Ditamores' remedial structural modifications made on behalf of Sellers prior to putting the Property on the market were not adequate work was inadequate and that the structure of the house is

25

~~still~~Residence's structural integrity was – and remains – significantly compromised ~~materially affecting the value of the Property~~and at risk of collapse.

97.   ~~36. Buyers~~In reaching that conclusion, Plaintiffs' construction consultant (and painting contractors ~~have identified~~) also noted various evidence of the Ditamores' knowledge and concealment of the settling, structural defects, and resulting damage to the Property, to wit: multiple areas of ~~patched/bulged (concealed) and~~ fractured exterior plaster/stucco, which ~~shows evidence of structural settling and movement.~~

~~37.   Sellers applied new cement on top of~~the Ditamores had attempted to patch over, which had since returned;  the separation of the exterior lava rock veneer siding ~~located against~~from the ~~side~~exterior wall of the ~~house by~~Residence, which the ~~post to conceal separation off of the structure~~Ditamores had attempted to cover with new cement, which ~~has~~had since ~~reoccurred.~~

~~38.   Sellers tiled over the new post footing and the adjacent post footing concealing any modification.~~

~~39.   Sellers also covered up numerous~~returned; multiple cracks and fractures in the ~~interior~~ drywall, which the Ditamores had attempted to cover with crack filler, retexturing spray, and ~~painting thereby preventing visible discovery of the defects.  A paint label left by Sellers shows it was purchased~~paint bought only

26

three days ~~prior to Sellers' self-procured home inspection.  Fracture and cracks in these areas have~~<u>before the First Home Inspection, which also had since</u> returned.

~~40.    Sellers contacted the original painter to inquire about the cracks occurring within the house structure.~~

<u>98.    In conjunction with their retention of a construction consultant, Plaintiffs also retained a consulting engineer to perform a subsurface investigation at the Property, focusing on the soils at the area where the settling occurred, and to make recommendations as to repairs necessary to restore the Residence's structural integrity.</u>

<u>99.</u>    ~~41. The source of the distressed column~~<u>As to causation, Plaintiff's consulting engineer noted the following facts: the Property lacked proper drainage, particularly where the settling post is located; the post</u> and its base ~~is due to poor/improper site drainage combined with~~<u>are sitting on</u> several feet of uncompressed fill<u>, which lacks sufficient load-bearing capacity;</u> and ~~an~~<u>immediately</u> adjacent <u>to the post and base is a </u>slope ~~that~~<u>which</u> is ~~over-steepened~~<u>overly steep</u> and ~~not secure~~<u>unstable</u>.

~~42.    When raining, the front and side yards visibly fill with water, creating puddling, flooding, and drainage problems.~~

27

43.    During Buyers' investigation into the structural issues, Buyers asked their construction consultant to investigate the structural integrity of the foundation/crawlspace beneath the house.

44.    The construction consultant informed Buyers of the presence of mold-like substances on the wood structural beams within the crawlspace, which is located beneath the living space of the house.

45.    The

100.   As to required repairs and remediation, Plaintiff's consulting engineer recommended that: the base of both posts on the northwest side of the Residence, along with the basement's foundation, needed to be underpinned with micropiles reaching three feet into load-bearing soil, as further determined by a structural engineer; the slope needed to be stabilized with a concrete grade beam, also underpinned with micropiles; and an outdoor drainage system needed to be installed to ensure proper drainage at the Property, where ponding had been observed during normal rainfall.

**Mold and Efflorescence**

101.   Unfortunately, Plaintiffs also came to learn that the poor drainage and other deficiencies in design and construction led to significant and recurring mold throughout the Residence, further endangering the health of themselves and their children.

28

894204.1
1010019.1

102.   While the Ditamores and KHI had disclosed and noticed the presence of some limited mold at the Residence in the First Home Inspection Report and the SRPD, both the Ditamores and KHI were largely dismissive of its presence, claiming either that the causes for the mold had been remediated or that the mold could be treated with a little bleach.

103.   Now, Plaintiffs and their construction consultant have noted the presence of ~~extensive~~ visible mold growth throughout the ~~foundation/~~crawlspace and ~~also within~~elsewhere in the ~~occupied spaces of the house is due to physical deficiencies conducive~~Residence, as well as indications that the moldy surfaces were cleaned by the Ditamores prior to the listing and showing of the Property.

104.   The Ditamores never disclosed to Plaintiffs that in January 2019, the Ditamores had hired KRC to clean mold ~~including water infiltration into~~located in the crawlspace ~~from multiple sources materially affecting the value~~underneath the Residence, that KRC had recommended to the Ditamores that the crawlspace needed more ventilation to prevent the recurrence of mold, or that the ~~property.~~

~~46.   It also appeared the structural beams in the crawlspace had been previously cleaned.~~

29

47.    Upon further investigation, Buyers determined that Sellers obtained an estimate from a local "restoration" company, Kauai Restoration and Cleaning, to "clean" the mold.

48.    Upon information and belief, Sellers paid approximately $4,712.00 for remedial work to "clean" the mold.  Sellers did not disclose the remedial work on the SRPD.

49.    The Sellers' efforts to "clean" the mold was only a temporary control measure and not an adequate means to eliminate the mold problem.

50.    The crawlspace ventilation is in violation of the building code and is not

built according to the building plans approved by the County of Kauai. Ditamores had failed to follow KRC's recommendation.

105.    The inadequate ventilation of the crawlspace is a violation of the building code; the crawlspace was not built in accordance with the permit set of drawings submitted to and approved by the County of Kauai; apparently, the crawlspace's ventilation and design were altered during construction by the Ditamores with GRA's knowledge and approval.

106.    Plaintiffs have also noted recurring efflorescence on the basement concrete floor, indicating that the poor drainage at the Property has caused moisture to accumulate under and in the slab. Once again, Plaintiffs could

30

894204.1
1010019.1

not have discovered this earlier, because the Ditamores made no reference to it in either the SRPD or in their subsequent communications to Plaintiffs and – upon information and belief – the Ditamores applied a concrete stain or an acidic cleaner to the basement floor prior to listing and showing the Property to conceal the efflorescence.

**Failed Mediation and Plaintiffs' Forced Relocation**

107.    Upon discovering the extent of the undisclosed defects in and defects to the Property, Plaintiffs demanded that the Ditamores participate in mediation pursuant to the Purchase Contract.

108.    To their realtor, the Ditamores complained that Plaintiffs were "crazy" and that selling the Property to Plaintiffs was a mistake.

109.    Mediation failed.

110.    Plaintiffs started to suffer physically from the prevalent mold at the Property; Plaintiff Karina Rowan's blood test confirmed that she had been exposed to high levels mycotoxins, for which she received treatment and medication.

111.    Plaintiffs decided to relocate, rather than continue to risk the health and safety of themselves or their children by living in what they had believed would be their $2.7 million dream home.

112.   Thus, Plaintiffs have incurred and continue to incur relocation costs, as well as medical costs, and they continue to develop plans to perform an adequate repair and remediation of the serious defects in and damage to the Property, the costs of which will be significant.

113.   Due to the grossly negligent and willful misconduct of the Defendants, Plaintiffs' $2.7 million "dream home" has become a waking nightmare.

COUNT I
(Fraud/Intentional Misrepresentation: Ditamores)

114.   51. BuyersPlaintiffs repeat, reallege, and incorporate herein the allegations contained in the foregoing paragraphs 1 through 50 of this Complaint.

52.   Sellers intentionally made express and implied representations of material fact, or omitted material facts, and failed to disclose to Buyers or concealed material facts from Buyers.

53.   As set forth herein, Sellers

115.   Immediately prior to and after entering into the Purchase Contract, the Ditamores made themultiple express and implied representations before entering in the Purchase Contract, after entering into the Purchase Contract during the disclosure period, and prior to closing ofto Plaintiffs regarding the salecondition of the Property.

~~54.    These express and implied representations include, but are not limited to, representations that there were no material issues with respect to water intrusion, code violations, unpermitted work, and all other material conditions described herein and to be discovered upon further investigation.~~

116.   Whether by affirmative statement or omission, such representations included, but were not limited to, the following material facts: that there was no filled land at the Property; that there were no concerns regarding grading or soils at the Property; that there were no concerns regarding the Property's drainage; that no repair work had been performed on the Residence's structural elements; that there were no concerns regarding the Residence's settling or structural integrity; that there were no concerns regarding water intrusion, mold or efflorescence at the Property; and that the Project was designed and constructed in a manner that fully complied with applicable code and County of Kauai requirements.

117.   ~~55. Sellers'~~The foregoing representations were false, and ~~were~~the Ditamores made them with knowledge of their falsity ~~and/~~or in reckless disregard for ~~the~~their truth or falsity~~of~~.

118.   The Ditamores made such ~~representations and non-disclosures, and~~misrepresentations, whether by affirmative statement or omission, with knowledge that the ~~information was false.~~

33

56.    Sellers intended~~intention~~ that ~~Buyers~~Plaintiffs would rely upon ~~such representations and concealments~~them.

119. ~~57. Buyers~~Plaintiffs did~~,~~ in fact~~,~~ reasonably rely upon ~~Sellers~~the Ditamores' misrepresentations ~~and concealments and omissions to Buyers~~to Plaintiffs' detriment.

120. ~~58.~~As a direct, proximate, and foreseeable result of ~~Sellers~~the Ditamores' intentional misrepresentations ~~and concealment of material facts,~~ ~~Buyers~~, Plaintiffs have been damaged in ~~amounts~~an amount to be proven at trial.

COUNT II
(Negligent Misrepresentation: Ditamores)

121. ~~59. Buyers~~Plaintiffs repeat, reallege, and incorporate herein the allegations contained in the foregoing paragraphs ~~1 through 58~~ of this Complaint.

60.    Sellers negligently made express and implied representations of material fact or failed to disclose, omitted, or concealed material facts to Buyers.

61.    As set forth herein, the express and implied representations were made Immediately prior to and after entering ~~in~~into the Purchase Contract, ~~during the disclosure period, pursuant to the Disclosure Statement, and prior to~~ ~~closing of~~the Ditamores made multiple express and implied representations to Plaintiffs regarding the ~~sale~~condition of the Property.

34

62.    These express and implied representations include, but are not limited to, representations that there were no material issues with respect to water intrusion, code violations, unpermitted work, and all other material conditions described herein and to be discovered upon further investigation.

122.    Whether by affirmative statement or omission, such representations included, but were not limited to, the following material facts: that there was no filled land at the Property; that there were no concerns regarding grading or soils at the Property; that there were no concerns regarding the Property's drainage; that no repair work had been performed on the Residence's structural elements; that there were no concerns regarding the Residence's settling or structural integrity; that there were no concerns regarding water intrusion, mold or efflorescence at the Property; and that the Project was designed and constructed in a manner that fully complied with applicable code and other County of Kauai requirements.

123.    63. Sellers'The foregoing representations were false, and werethe Ditamores made them without due care for and/or in reckless disregard for the truth or falsity of such representations.

64.    Sellers knew or should have known that Buyers would reasonably rely upon such representations and non-disclosures.

65.    Buyers

35

124. The Ditamores made such misrepresentations, whether by affirmative statement or omission, with the intention that Plaintiffs would rely upon them.

125. Plaintiffs did, in fact, reasonably rely upon ~~Sellers' representations and non-disclosures~~the Ditamores' misrepresentations to ~~Buyers~~Plaintiffs' detriment.

126. ~~66.~~As a direct, proximate, and foreseeable result of ~~Sellers'~~the Ditamores' negligent misrepresentations ~~and non-disclosures, Buyers~~, Plaintiffs have been damaged in ~~amounts~~an amount to be proven at trial.

<u>COUNT III</u>
(Breach Of Contract: Ditamores)

127. ~~67. Buyers~~Plaintiffs repeat, reallege, and incorporate herein the allegations contained in the foregoing paragraphs ~~1 through 66~~of this Complaint.

128. ~~68.~~The Purchase Contract, which incorporates the SRPD by reference, constitutes a written and enforceable contract ~~under~~pursuant to which ~~Sellers warranted and~~the Ditamores agreed ~~to, among other things, fully and accurately disclose in writing any fact, defect, or condition~~and obliged to make accurate and complete disclosures to the Plaintiffs of any and all material facts, defects, damages, repairs, conditions, or other matters regarding the Property, past

36

or present, ~~that would~~<u>which could</u> be expected to measurably affect the value of the Property to a reasonable person.

129.   ~~69. Buyers have fulfilled all of their promises and obligations under~~<u>By failing to make accurate and complete disclosures to Plaintiffs, the Ditamores materially breached</u> the Purchase Contract.

~~70.   Sellers committed material breaches of the contract by their actions as discussed herein.~~

130.   ~~71.~~Due to the <u>undisclosed</u> defects <u>in</u> and ~~condition of~~<u>damage to</u> the Property, ~~Buyers did~~<u>the Property is</u> not ~~receive~~<u>worth</u> the ~~benefit of the bargain promised by Sellers in~~<u>$2.7 million purchase price that the Plaintiffs paid to the Ditamores pursuant to</u> the Purchase Contract.

~~72.   Sellers' breaches are material, go to the root of the contract, and constitute a total breach thereof entitling Buyers to rescission, among other remedies.~~

~~73.   Sellers'~~

131.   <u>As a direct, proximate, and foreseeable result of the Ditamores' material</u> breaches of ~~contract proximately caused damage to Buyers~~<u>the Purchase Contract, Plaintiffs have suffered damages</u> in an amount to be proven at trial.~~.~~<u>.</u>

COUNT IV
(Breach Of The Implied Covenant Of Good Faith
And Fair Dealing<u>: Ditamores</u>)

894204.1
1010019.1

132.   74. Buyers Plaintiffs repeat, reallege, and incorporate herein the allegations contained in the foregoing paragraphs 1 through 73 of this Complaint.

133.   75. In all contracts, including the Purchase Contract, there is an implied covenant of good faith and fair dealing.

134.   76. Sellers The Ditamores'  conduct, as described herein, constitutes a breach of the implied covenant of good faith and fair dealing.

135.   77. As a direct, proximate, and foreseeable result of Sellers the Ditamores' breach of the implied covenant of good faith and fair dealing, Buyers Plaintiffs have been damaged in an amount to be proven at trial.

<u>COUNT V</u>
(Violations Of Hawaii Revised Statutes
Chapter 508D: Ditamores)

136.   78. Buyers Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the foregoing paragraphs 1 through 77 of this Complaint.

137.   79. With respect to the sale of the Property and as required by the Purchase Contract, Sellers the Ditamores were obligated to prepare and deliver a to Plaintiffs an accurate and complete disclosure statement as required by HRS Chapter 508D.

38

138.   80. Sellers The Ditamores intentionally or negligently failed to deliver a an accurate and complete disclosure statement in accordance with HRS Chapter 508D's requirements.

139.   81. As a direct, proximate and foreseeable result of Sellers the Ditamores' failure to deliver a an accurate and complete disclosure statement in accordance with HRS Chapter 508D, Buyers's requirements, Plaintiffs have been damaged in an amount to be proven at trial, among other remedies, and are entitled to recover their attorneys' fees and costs under HRS Chapter 508D.

## COUNT VI

(Fraudulent Inducement Against Sellers)
Negligent Hiring and Supervision: Ditamores)

140.   82. Buyers Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the foregoing paragraphs 1 through 81 of this Complaint.

83.   Sellers performed fraudulent work at

141.   As owner-builders of the Property and made intentional misrepresentations, the Ditamores hired Nicely as an employee to the condition of the Property with respect to:

a.   There being no structural or foundational problems and no problems with water intrusion; water infiltration; grading, flooring and drainage

39

problems; settling, subsidence, or soil problems; filled land; mold and treatment of mold;

b.    All work performed by Sellers being code compliant;

c.    All work performed by Sellers being free from any defects;

d.    All work performed by Sellers being properly permitted;

e.    There being no material issues with the Property that prevented its sale; and

f.    All other material conditions described herein and to be discovered upon further investigation.

84.    Sellers' work at the Property and representations as to the condition of the Property were intentionally performed and made with the intent of inducing Buyers to purchase the Property.

85.    At perform general contracting services in the construction of the Project.

142.    In hiring Nicely and supervising his work on the Project, the Ditamores had a duty to ensure that Nicely was qualified to perform the work and that Nicely's work was performed in a workmanlike manner and in compliance with applicable building code and other County of Kauai requirements.

40

894204.1
1010019.1

143.   By the time that the Ditamores hired Nicely, he was unlicensed to perform general contracting services in the State of Hawaii.

144.   Moreover, as set forth above, much of Nicely's work on the Project was performed and the representations were made, Sellers knew that the Property contained the material defects described herein and that the Property was not in the condition that was being represented by Sellers to Buyers.

86.   Sellers made the representations with the intent to deceive Buyers and for the purpose of inducing Buyers to execute the contract and complete the sale of the Property. in an unworkmanlike manner, and in violation of applicable building code and other County of Kauai requirements.

145.   These failures and violations have left the Residence unsafe, riddled with defects and damage.

146.   To the extent that the Ditamores directed and supervised Nicely's work, they are liable for the damage his negligence has caused; to the extent that the Ditamores failed to direct and supervise Nicely's work, they are liable for the damage his negligence has caused.

147.   87. In reliance on and as As a direct, proximate, and foreseeable result of Sellers' actions and representations described herein, Buyers the Ditamores' negligent hiring and supervision of Nicely, Plaintiffs have been damaged suffered damages in an amount to be proven at trial.

41

88.    Sellers' fraudulent inducement of Buyers, as described herein, entitles Plaintiff to rescission of the Purchase Contract, among other remedies.

COUNT VII

(Promissory Estoppel Against Sellers)
Breach of Implied Warranty of Habitability: Ditamores)

148.   89. BuyersPlaintiffs repeat, reallege, and incorporate by reference the allegations contained in the foregoing paragraphs 1 through 88 of this Complaint.

90.    Sellers made express and implied promises and representations to Buyers relating to the condition of the Property as discussed above.

91.    Sellers intended for Buyers to rely on Sellers' promises and representations, and intended or should reasonably have expected that the promises would induce Buyers to act or forbear from acting.

92.    Buyers reasonably relied on Sellers' promises to their detriment.

93.    Injustice to Buyers can only be avoided by enforcing Sellers' promises.

94.    Sellers therefore should be estopped from asserting that their promises are unenforceable, and the Court should enforce these promises and

award Buyers rescission and damages they suffered and will suffer as a result of Sellers' breach of promises and other actions.

149.   As the builder-owners and sellers of the Property, the Ditamores impliedly warranted to Plaintiffs that the Residence was safe and habitable.

150.   The undisclosed defects in and damage to the Residence rendered it unsafe and substantially unsuitable for living, such that Plaintiffs were forced to leave the Property.

151.   As a direct, proximate, and foreseeable result of the Ditamores' breach of the implied warranty of habitability, Plaintiffs have suffered damages in an amount to be proven at trial.

<u>COUNT VIII</u>
(Unjust Enrichment Against Sellers: Ditamores)

152.   95. BuyersPlaintiffs repeat, reallege, and incorporate by reference the allegations contained in the foregoing paragraphs 1 through 94 of this Complaint.

153.   96. Sellers The Ditamores have been unjustly enriched by receiving the purchase price at the expense of BuyersPlaintiffs by their actions herein.

894204.1
1010019.1

154.   ~~97.~~ As a proximate result of ~~Sellers~~the Ditamores' unjust enrichment, ~~Buyers~~Plaintiffs have been damaged in an amount to be proven at trial.

155.   ~~98.~~ Based on ~~Sellers~~the Ditamores' unjust enrichment, ~~Buyers~~Plaintiffs are entitled to rescission, damages, and such other relief as this Court deems just and proper.

<u>COUNT IX</u>
(Constructive Trust ~~Against Sellers~~: Ditamores)

156.   ~~99. Buyers~~Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the foregoing paragraphs ~~1 through 98~~ of this Complaint.

157.   ~~100.~~ By ~~the~~their conduct ~~of Sellers~~ described above, ~~Sellers~~the Ditamore have wrongfully deprived ~~Buyers~~Plaintiffs of the amounts paid under the ~~contract~~Purchase Contract.

158.   ~~101.~~ To prevent damage to ~~Buyers, Sellers~~ Plaintiffs, the Ditamores must hold any and all sums of money, and properties controlled by ~~Sellers~~the Ditamores, arising from, related to, or converted from the amounts fraudulently taken from ~~Buyers~~Plaintiffs in a constructive trust for the benefit of ~~Buyers~~Plaintiffs.

44

159.   102. BuyersPlaintiffs shall have the right to obtain the wrongfully obtained funds in an amount to be proven at trial.

COUNT X
(Intentional Infliction of Emotional Distress: Ditamores)

160.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint.

161.   As owner-builders and sellers of the Property, the Ditamores owed duties to Plaintiffs, as purchasers of the Property.

162.   Among those duties was an obligation to make full and accurate disclosures to Plaintiffs regarding any material facts regarding the Property's condition, including but not limited to defects in and damage to the Property and Residence.

163.   Rather than comply with those duties, the Ditamores actively misrepresented the condition of the Property and the Residence, and concealed from Plaintiffs defects in and damage to the Property and Residence so that the Plaintiffs would close on their purchase of the Property and the Ditamores would receive the agreed-upon $2.7 million purchase price.

164.   The defects in and the damage to the Property and Residence, which the Ditamores actively concealed, have negatively affected the $2.7 million Property's value, threatened the health and safety of Plaintiffs and their children,

45

894204.1
1010019.1

caused Plaintiffs to suffer physical injury, and forced Plaintiffs to move out of the Property entirely.

165.   The Ditamores' conduct, which was outrageous, without just cause or excuse, and beyond all bounds of decency, has caused Plaintiffs to suffer extreme emotional distress.

166.   As a direct, proximate, and foreseeable result of the Ditamores' intentional infliction of emotional distress, Plaintiffs have suffered damages in an amount to be proven at trial.

COUNT XI
(Negligent Infliction of Emotional Distress: Ditamores)

167.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint.

168.   As owner-builders and sellers of the Property, the Ditamores owed duties to Plaintiffs, as purchasers of the Property.

169.   Among those duties was an obligation to make full and accurate disclosures to Plaintiffs regarding any material facts regarding the Property's condition, including but not limited to defects in and damage to the Property and Residence.

170.   Rather than comply with those duties, the Ditamores negligently misrepresented the condition of the Property and the Residence, and

46

failed to disclose to Plaintiffs defects in and damage to the Property and Residence, so that the Plaintiffs would close on their purchase of the Property, and the Ditamores would receive the agreed-upon $2.7 million purchase price.

171.   The defects in and the damage to the Property and Residence, which the Ditamores failed to disclose or otherwise misrepresented, have negatively affected the $2.7 million Property's value, threatened the health and safety of Plaintiffs and their children, caused Plaintiffs to suffer physical injury, and forced Plaintiffs to move out of the Property entirely.

172.   The Ditamores' negligent conduct has caused Plaintiffs to suffer serious emotional distress.

173.   As a direct, proximate, and foreseeable result of the Ditamores' negligent infliction of emotional distress, Plaintiffs have suffered damages in an amount to be proven at trial.

COUNT XII
(Negligence: Cascade and GRA)

174.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint.

175.   Cascade and its agent GRA had non-delegable duties to design the Residence in conformity with applicable building code and County of Kauai permitting requirements.

894204.1
1010019.1

176.   Cascade and GRA breached, and deliberately evaded, those obligations by, among other things, deleting the contour lines from the permit set's site plan to avoid the County of Kauai's requirement for a grading permit and a geotechnical or civil engineer to perform a soil study and develop a grading plan.

177.   As a result of Cascade and GRA's conduct, no geotechnical or civil engineer conducted a soil study or developed a grading plan prior to or during construction of the residence, which led directly to drainage problems at the Property, as well as settling and structural failure of and water intrusion at the Residence.

178.   Additionally, while Cascade's permit set of plans and drawings called for a ventilated crawlspace, during construction Cascade, GRA and the Ditamores agreed to change the design to include an unvented crawlspace, which – with limited exceptions – are generally impermissible under applicable building code. The crawlspace, as actually designed and constructed, does not satisfy the limited permissible exceptions, and therefore violates applicable building code. GRA agreed to the change despite knowing that unventilated crawlspaces increase the risk for mold growth.

179.   Moreover, neither Cascade nor GRA, in their capacities as design professionals, visited the Project during construction to observe and inspect

894204.1
1010019.1

the quality of the work and whether that work conformed with the design documents or applicable code requirements.

180.   Instead, Cascade and GRA took a thoroughly hands-off approach, delegating their responsibilities as licensed design professionals to the Ditamores and Nicely, whom Cascade knew or should have known were inexperienced and unqualified to handle such responsibilities.

181.   Cascade and GRA's failures have resulted in conditions at the Property which threaten not only the Residence itself but also the health and safety of its occupants.

182.   As a direct, proximate, and foreseeable result of Cascade's and GRA's negligence, Plaintiffs have suffered damages in an amount to be proven at trial.

COUNT XIII
(Negligence: Beaudette)

183.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint.

184.   As the Project's structural engineer, Beaudette had a non-delegable duty to ensure that the Residence, as designed and built, would be structurally sound and in conformity with applicable building code and County of Kauai permitting requirements.

49

894204.1
1010019.1

185.   In assessing the structural integrity of the Residence's design, and whether that design complied with applicable building code and County of Kauai permitting requirements, Beaudette simply assumed – but took no steps to confirm – that the Property's soil had sufficient load-bearing capacity.

186.   However, the Property's soil lacked sufficient load-bearing capacity, Beaudette's calculations were wrong, and the Residence is structurally unsound, unstable, and unsafe.

187.   Beaudette's failures have resulted in conditions at the Property which threaten not only the Residence itself but also the health and safety of its occupants.

188.   As a direct, proximate, and foreseeable result of Beaudette's negligence, Plaintiffs have suffered damages in an amount to be proven at trial.

COUNT XIV
(Conspiracy to Violate Applicable Building Code and County Requirements:
Ditamores, Cascade, GRA, Beaudette)

189.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint.

190.   The Ditamores, as owner-builders, and Cascade, GRA, and Beaudette, as the Project's design professionals, engaged in concerted action to evade and violate applicable building code and County of Kauai permitting requirements.

50

191.    Accordingly, the Residence was not designed or built in conformity with applicable building code and County of Kauai permitting requirements, the Residence suffers from multiple defects and damages, and presents health and safety risks to Plaintiffs and their children.

192.    As a direct, proximate, and foreseeable result of the Ditamores' and their design professionals' concerted and wrongful conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

COUNT XV
(Breach of Contract: KHI)

193.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint.

194.    Plaintiffs and KHI entered into a written and enforceable contract, pursuant to which KHI agreed to provide the Second Home Inspection Report in exchange for Plaintiffs' payment of $1,467.74.

195.    Pursuant to that agreement, KHI stated that the primary "focus" of Second Home Inspection Report was the detection, observation, and recommendation for repair of "major defects and safety issues" at the Property and Residence.

196.    As noted above, and in breach of its obligations pursuant to its written contract with Plaintiffs, KHI failed to notice and notify Plaintiffs of

51

multiple pre-existing major defects in and damages to the Property and the

Residence, which now threaten the health and safety of Plaintiffs and their

children.

197.   As a direct, proximate, and foreseeable result of KHI's breach

of their contract with Plaintiffs, Plaintiffs have suffered damages in an amount to

be proven at trial.

COUNT XVI
(Negligence: KHI)

198.   Plaintiffs repeat, reallege, and incorporate by reference the

allegations contained in the foregoing paragraphs of this Complaint.

199.   In performing inspections of the Property and issuing the First

Home Inspection Report and the Second Home Inspection Report, KHI had a duty

to notice and report on major defects and safety issues at the Property and

Residence.

200.   Despite having two opportunities, KHI failed to notice or report

on major defects and safety issues at the Property and Residence, and KHI failed to

recommend suitable repairs for such defects and safety issues.

201.   For instance, KHI failed to notice the Property's improper

grading, drainage, and structural issues; it failed to notice the evidence of such

issues, which were or should have been apparent at the time of the inspections; and

KHI failed to recommend sufficient repairs for the issues it failed to notice as well as those issues it did notice.

202.   And although KHI's principals and agents hold themselves out as certified mold inspectors and moisture intrusion specialists, KHI failed to notice mold in the crawlspace, where it was likely to occur and recur, given the lack of ventilation, evidence of past water intrusion, prior cleaning of the structural beams, cupping on the wood floor directly above the crawlspace, and the improper grading and negative slope into the crawlspace.

203.   Additionally, KHI failed to notice efflorescence on the basement's concrete floor and mold on the wood floor directly above the basement slab.

204.   As a result of KHI's negligence, Plaintiffs were uninformed as to major defects and safety issues at the Property and Residence, and Plaintiffs purchased the Property, which now threatens the health and safety of Plaintiffs and their children.

205.   As a direct, proximate, and foreseeable result of KHI's negligence, Plaintiffs have suffered damages in an amount to be proven at trial.

WHEREFORE, ~~Buyers~~Plaintiffs pray that judgment be entered in their favor and against ~~Sellers~~ Defendants  as follows:

A.      For rescission of the Purchase Contract and the purchase and sale of the Property;

B.      For general, special, incidental and consequential damages in amounts to be proven at trial;

C.      For treble and punitive damages;

D.      For imposition of a constructive trust of the proceeds from the sale of the Property;

E.      For rescission of the sale of the Property;

E.      F. For their attorneys' fees, costs and expenses;

G.      For treble damages; and

H.      For punitive damages; and

F.      I. For such other and further relief as this Court deems just and proper.

DATED: Honolulu, Hawaii, September 17August  , 20202021.

/s/ Jason W. Jutz
KARIN L. HOLMA
JASON W. JUTZ
MARK R. ZENGER
BRUCE D. VOSS
JOHN D. FERRY III

Attorneys for Plaintiffs
KARINA ROWAN and FRANK ROWAN

54

894204.1
1010019.1

IN THE ~~CIRCUIT~~UNITED STATES DISTRICT COURT ~~OF~~

FOR THE ~~FIFTH CIRCUIT~~

~~STATE~~DISTRICT OF ~~HAWAII~~HAWAI'I

| | |
|---|---|
| KARINA ROWAN and FRANK ROWAN, | ) CIVIL NO. |
| | ) _____20-00543 JMS-RT |
| Plaintiffs, | ) (Contract) |
| | ) |
| vs. | ) DEMAND FOR JURY TRIAL |
| | ) |
| KEVIN DITAMORE; AYUMI DITAMORE; CASCADE JOINERY, INC.; GREG ROBINSON, dba as GREG ROBINSON ARCHITECT; BEAUDETTE CONSULTING ENGINEERS, INC., nka DCI ENGINEERS, INC.; HOMESCOOP INC., dba KAUAI HOME INSPECTION SERVICES; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE ENTITIES 1-~~10~-10; and DOE GOVERNMENTAL ENTITIES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## DEMAND FOR JURY TRIAL

Trial by jury is hereby demanded in the above-entitled action on all triable issues.

DATED: Honolulu, Hawaii, ~~September 17~~August __, ~~2020~~2021.

~~/s/ Jason W. Jutz~~
~~KARIN L. HOLMA~~
~~JASON W. JUTZ~~
~~MARK R. ZENGER~~

/s/ _____
BRUCE D. VOSS
JOHN D. FERRY III

Attorneys for Plaintiffs
KARINA ROWAN and FRANK ROWAN

2

490242
894204.1
1010019.1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| KARINA ROWAN and FRANK ROWAN, | ) ) ) | CIVIL NO. 20-00543 JMS-RT (Contract) |
| Plaintiffs, | ) ) | CERTIFICATE OF SERVICE |
| vs. | ) ) ) | |
| KEVIN DITAMORE; AYUMI DITAMORE; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE ENTITIES 1-10; and DOE GOVERNMENTAL ENTITIES 1-10, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was

served on August _, 2021, on the following counsel of record and/or parties

electronically via CM/ECF:

RANDALL K. SCHMITT, ESQ.
NICHOLAS K. N. KIDO, ESQ.
Five Waterfront Plaza, 4th Floor
500 Ala Moana Boulevard
Honolulu, Hawai‘i 96813
Telephone: (808) 529-7300
schmitt@m4law.com
NKK@m4law.com

Attorneys for Defendants
KEVIN DITAMORE and
AYUMI DITAMORE

DATED: Honolulu, Hawaii, August _, 2021.


/s/
BRUCE D. VOSS
JOHN D. FERRY III

Attorneys for Plaintiffs
KARINA ROWAN and FRANK
ROWAN